32481. STILES *v.* EDWARDS.

DECIDED JUNE 1, 1949.

*Eugene A. Epting*, for plaintiff in error.

*John L. Green, James Barrow*, contra.

FELTON, J. W. L. Bradberry, a witness for the plaintiff, testified: "My name is W. L. Bradberry, and I am engaged in real estate insurance, and mortgage loan business in Athens, and have been so engaged since 1933 or 1934. I can identify the signatures on the paper shown me (plaintiff's exhibit 1). J. C. Stiles signed it as seller and W. L. Edwards as the purchaser. I saw both signatures made. I understand that Mr. Stiles is the defendant and Mr. Edwards is the plaintiff in this case. As to what led up to the signing of this instrument, Mr. Stiles called me and asked me what I thought he could rent his home for, and after discussing the possibilities of renting it, I hung up the phone and began to think that possibly he would sell it because I thought I could get him to sell it and give him a good reason for selling it rather than renting it, because we saw signs at that time of property becoming cheaper or 'leveling off,' as the stress and strain of people looking for homes was easing considerably, and that he might lose more in the value drop of the property

than he would get in renting it for the twelve months. The next morning I told him I thought I could sell it for $18,000, and he told me that he would take $18,000 for it. I then went to Mr. Edwards and told him that he wanted $18,000 for it, and Mr. Edwards offered $17,000, and I went back to Mr. Stiles and he said, 'I will split the difference and sell it for $17,500.00,' and I went to the office and drew the contract, when Mr. Edwards agreed to pay the $17,500, and carried it to Mr. Edwards and collected the $500 binder. Mr. Edwards signed it, and I took it to Mr. Stiles, and Mr. Stiles called his wife and turned from the phone and signed the contract. In two, three, or four days later I had a call from Mr. Stiles and he said that his wife wouldn't give a deed, and that the property was in his name and her name. That was the first I had heard about the property being owned jointly. Mr. Stiles did not tell me someone else had an interest in the property at the time he signed this instrument. As Bradberry Realty Company, which is my trade name, I have the $500 Mr. Edwards paid to me. Mr. Stiles requested me to return that to Mr. Edwards, but I have forgotten what day that was. . . I would not say that Mr. Stiles required me to get a binder. He did not suggest how much I was to get. I received this binder for Mr. Stiles. Mr. Stiles called his wife before he signed this instrument. I am not sure about the exact language, but he said, 'Bradberry is here and says that he has someone who wants to buy the house,' and then said, 'I say sell it,' or words to that effect. He then hung up and signed the agreement. I did not hear the conversation on the other end. . . I first talked with Mr. Stiles about renting the house, and next morning talked with him about selling it. . . I told Edwards that I was going to try to get Mr. Stiles to sell his home, and Edwards said he would be interested in it. I did not require any listing from Mr. Stiles. I talked with Mr. Stiles, then to Mr. Edwards, then to Mr. Stiles, then to Mr. Edwards again. Mr. Edwards signed the contract first, and he gave his check to Bradberry Realty Company, and it was deposited in our trust account, and the money is still there. Mr. Stiles called me two or three days after the contract was signed and said that his wife was joint owner with him in the property and she wouldn't give the deed. I immediately communicated

this to Mr. Edwards. I don't know that I offered to refund his binder in definite terms. . . I have always been ready and willing to give the binder back if he wanted it, and I took the position I could not refund the binder until Mr. Edwards asked me to, because that is more or less a trust fund as earnest money in the sale of property, and we are agents in the delivery and naturally we don't do anything unless both parties agree. Mr. Stiles told me he could not make a deed and to call the deal off or words to that effect. I took the attitude that he was willing to cancel the contract, and that I had his consent to cancel it, but Mr. Edwards did not see it that way. . . Prior to the making of the contract I had not been told anything about Mrs. Stiles' interest or lack of interest in the property. I knew that Mr. Stiles called her and asked about selling it, but I did not know whether she owned an interest in it or not. Mr. Edwards did not ask me whether Stiles had a good title or not. After the contract was signed I told Mr. Edwards that he could get his lawyer to run the title to find out if everything was all right, and he said he would do that. So far as I know Mr. Edwards was not relying on any representation as to Mr. Stiles having title to the property, other than the signing of the contract."

W. L. Edwards, plaintiff, testified: "On Monday Mr. Bradberry came by my place and said he was going to talk to Mr. Stiles, and he said 'I think he wants to sell his house,' and Mr. Bradberry came back from Mr. Stiles' office and said, 'He wants $18,000 for the house,' and I said, 'Let's offer him $17,000,' and we compromised at $17,500, and Mr. Bradberry said, 'I'll go up and draw the contract and bring it down to sign,' which I did, and I gave him a check for $500, and then he went to Mr. Stiles and Mr. Stiles signed it, and Mr. Bradberry brought me back a copy of the contract and told me I had bought the house. I employed an attorney to examine the title and offered to pay for his services. I don't know how much his services were because he has not rendered a bill as yet. Mr. Bradberry stated a while ago that it was three or four days after the signing of the contract, but I think it was nearer ten days, that I learned that Mr. Stiles was not going through with the contract, and at that time I learned through Mr. Bradberry that Mrs. Stiles was a co-owner, and her name was never brought out until then." J. C.

Stiles, defendant, testified: "I am J. C. Stiles, the defendant in this case. I have never discussed with Dr. Edwards the sale of my house, I never did make a statement to him as to who owned the title. I did not ever instruct Mr. Bradberry to make a statement as to who owned the title. When Mr. Bradberry brought this contract to me, Mr. Edwards had already signed it. I talked to Mrs. Stiles over the telephone about selling the house, and Mr. Bradberry was present at the time I talked with her. I did not know Mrs. Stiles would not agree to sign when I signed the contract, and my understanding was that she would sign. . . As soon as I realized Mrs. Stiles would not go ahead with the sale, I notified Mr. Bradberry. He is the only one I had ever spoken to about it. I told him that under the circumstances I could not go through with the sale. At the time I talked to Mr. Bradberry about renting the house, my reason for wanting to rent it was simply because my wife had been very seriously ill and was sick at the time I signed this contract, and she wasn't able to stay in a home like that, and we thought we would rent the house for a short period of time so she could get away from the house and recuperate and then move back into it. Mr. Bradberry talked with me next morning about selling the house. He told me that it would be more advisable to sell it, and if I could sell this house for $18,000, it would be a good sale, that real estate was going down every day, and that there was not as much demand for houses, and if I rented it a tenant would deteriorate my house, and his advice was to sell it for $18,000. I didn't have any idea of selling the house until he talked like that. I have not received anything whatever out of this sale. As far as I know Mr. Bradberry held the binder, and I never have received a penny of money. Three or four days after I signed this contract I called Mr. Bradberry and told him I could not deliver this property, and he asked why, and I stated, 'My wife refuses to sign a deed on the property,' and that she has been sick and is very much improved now, and she won't sign the deed, and I cannot go through with it. I called him as soon as I realized that Mrs. Stiles would not sign the deed."

Mrs. J. C. Stiles testified as follows: "I own a one-half undivided interest in the house in dispute. As to what my physical condition was at the time Mr. Stiles was investigating the possi-

bilities of renting the house, we had gone to Richmond, Virginia—I don't remember the exact date—and coming home from Richmond, just prior to my operation, I was extremely weak, and I told Mr. Stiles I thought I should see a doctor. I saw Dr. Harry Talmadge and he insisted I go to the hospital for observation on Monday following, which I did. Dr. Talmadge said I would have to have a very serious operation, which I did. The operation was before August 2, 1948. On August 2, 1948, I was back in my home. As to how long it had been since I came from the hospital, I remember that on July 4th I was released from the hospital for the first time, and after that I went back to the hospital. We were discussing the possibilities of renting out the house because I did not think at that time that I would be physically able to take care of my house which I had been doing myself. At the time Mr. Stiles called me after selling it, I did not feel that I would be able to continue taking care of the house. We did not consider the fact that we could employ capable servants to do it. After the contract was signed I changed my attitude about being able to take care of the house. I then said that I would not make the sale."

1. The court did not err in overruling the demurrers to the petition as amended. The allegations stated a cause of action for fraud and deceit.

2. The evidence did not follow the allegations of the petition, however, and the court erred in overruling the general grounds, and the special grounds elaborating thereon, of the motion for a new trial. In the first place, the evidence did not warrant the finding that Mr. Stiles misrepresented to the broker that he owned the house. The evidence shows that, when the defendant first discussed the house with the broker, he stated only that he wanted to rent "his house." At that time he had no idea of selling it. There is nothing in the evidence to show that later when he spoke of selling "it," he remembered having referred to the house as his own or that there was any reason to believe that he had designedly referred to the house as his, when he was trying to rent it, for the purpose of misleading the broker or any prospective renter or purchaser of the house. The petition alleges that the broker was acting in accordance with instructions from the defendant in making the misrepresentation. There is

no evidence to support this allegation, and the defendant specifically denied it. A real-estate broker ordinarily is an independent contractor (1 Restatement of the Laws of Agency, 12, § 2), and under a contract merely to find a purchaser for property is not by implication authorized to make representations as to the title to property so as to bind the party with whom he has contracted. It cannot be said in this case that the broker intended to make a representation that the title to the house was in the defendant, by merely referring to it as the defendant's house; but even if it could be so held, the defendant would not be bound by it when he did not expressly authorize it and had no reason to think that such a representation would be made or acted upon. The contract which was signed in this case was first signed by the plaintiff. Ordinarily, contracts for the sale of property are binding on both parties. The plaintiff contends that the instant contract is not binding on the defendant. This contention does not support the plaintiff's theory of fraud for two reasons: (1) if the contract is not binding on the defendant, it is not binding on the plaintiff; and (2) the evidence does not show that the defendant made the representation that the house was his own with a view of making a sale contract therefor by which he could bind the purchaser and escape liability himself. The provisions of the contract itself are not representations inducing its execution. But even if they could be so regarded, this contract provided that the defendant would convey the property or cause it to be conveyed. This eliminated even an agreement that the defendant owned the property. Furthermore, there is no evidence that the so-called misrepresentation was relied on, in that it induced the execution of the contract by the plaintiff. Ordinarily, where one enters into a binding contract to sell certain described property, he is bound by the contract to convey whether he owned the property at the time he agreed to sell it or not, and there is nothing to indicate that the plaintiff knew at the time he signed the contract that it was not binding on the defendant, or that he would not have executed it just as readily if he had known that the defendant owned only a half interest. The mere fact that the plaintiff executed the contract is insufficient to show that he relied on the alleged representation and that it induced him to sign the contract. If the

360

contract is binding on both parties, or if they had signed one that was binding, the plaintiff might have been as well satisfied with a judgment for breach of contract against the defendant, whether he refused to comply with its terms because he owned the property and decided not to sell it, or because he could not comply because he did not own the full title. Furthermore, the plaintiff was not in the exercise of ordinary care and diligence and had no right to rely on the alleged representation. *Browning v. Richardson*, 181 *Ga.* 413 (182 S. E. 516). The evidence did not authorize a finding that the defendant made a false representation to the broker, that the broker made it, or was authorized to make it, or that the plaintiff relied and acted on it to his injury.

The court erred in overruling the motion for a new trial.

*Judgment reversed. Sutton, C. J., and Gardner, J., concur. Parker, J., disqualified.*